# Illinois Official Reports

## Appellate Court

---

### *People v. Hancock*, 2014 IL App (4th) 131069

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. MARK LEE HANCOCK, Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-1069 |
| Filed | September 24, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The verdict denying respondent's recovery application from civil confinement as a sexually dangerous person was affirmed and the appellate court rejected his contentions that the verdict was against the manifest weight of the evidence and that the trial court erred in denying his motion *in limine* to bar evidence of the denial of an earlier recovery application, refusing to publish to the jury some purported judicial admissions by the State, and in denying his motion for a directed verdict, especially when conflict in the evidence as to whether respondent was making progress in his recovery precluded a directed verdict, and the verdict finding respondent was still a sexually dangerous person was not against the manifest weight of the evidence. |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 00-CF-1597; the Hon. John R. Kennedy, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

John B. Hensley, of Hensley Law Office, of Champaign, for appellant.

Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

PRESIDING JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Knecht and Holder White concurred in the judgment and opinion.

## OPINION

¶ 1   Since 2001, respondent, Mark Lee Hancock, has been in civil confinement as a sexually dangerous person. See 725 ILCS 205/8 (West 2012). In November 2010, he filed a recovery application (see 725 ILCS 205/9(a) (West 2012)), and in October 2013, a jury returned a verdict against him and in favor of the State, finding, by clear and convincing evidence, that he still was a sexually dangerous person (see 725 ILCS 205/9(b) (West 2012)).

¶ 2   Respondent appeals on four grounds.

¶ 3   First, he argues the trial court erred by denying paragraph 4 of his motion *in limine*, in which he sought to bar evidence that, in 2009, a previous recovery application by him was denied. We find no abuse of discretion in the ruling.

¶ 4   Second, he argues the trial court erred by declining to publish to the jury some purported judicial admissions by the State. In our *de novo* review of this issue, we find the purported judicial admissions to be nonexistent.

¶ 5   Third, he argues the trial court erred by denying his motion for a directed verdict. In our *de novo* review, however, when we look at the evidence in the light most favorable to the State, we are unable to say the evidence so overwhelmingly favors respondent that a verdict against him is rationally indefensible.

¶ 6   Fourth, he argues the verdict against him is against the manifest weight of the evidence. We reject this argument for the same reason we reject his argument that he was entitled to a directed verdict. The record contains evidence to support each element of the State's *prima facie* case, and it was the sole province of the jury to decide what weight to give to that evidence.

¶ 7   Therefore, we affirm the trial court's judgment.

¶ 8                    I. BACKGROUND
¶ 9              A. Respondent's Motion *in Limine*
¶ 10   Before the trial began, respondent filed a motion *in limine* to bar certain evidence. Paragraph 4 of the motion stated: "As to the procedural history, the State seeks to introduce that, on two previous occasions, [respondent] was found to remain a sexually dangerous

person. The jury will infer that [respondent] filed two previous restoration petitions that were denied by juries. This is not probative but rather is prejudicial and irrelevant to current issues." Thus, the motion requested the trial court to bar the State from eliciting evidence that, on two previous occasions, respondent was found to remain a sexually dangerous person.

¶ 11 The assistant State's Attorney responded that "the defense counsel's argument [might] be well-taken with respect to the 2005 recovery petition" but that the 2009 recovery petition was "significant for purposes of *** narrowing *** the jury's inquiry." (When we refer to the recovery petitions, or applications, of 2005 and 2009, we do not mean that the petitions were filed in those years but, rather, that they were judicially denied in those years.) He reasoned:

"I–I point out the obvious, the defense is obviously going to speak about the passage of time since he was first adjudicated sexually dangerous. If he was, in fact, as a matter of law sexually dangerous in 2009, that argument becomes much more limited in scope, the jury's inquiry becomes much more limited in scope and the defense becomes, I believe, significantly weaker. And for that reason, I believe it is significant to the jury's inquiry whether they're determining whether he has recovered in the last four years or whether he's recovered in the last decade. That's why I wanted to have [*sic*] submit the finding that he was found sexually dangerous in 2009."

¶ 12 The trial court concluded it was the law of the case that on July 23, 2009, respondent was found to remain a sexually dangerous person. Therefore, the court denied paragraph 4 as to the recovery application of 2009.

¶ 13 B. Respondent's Request To Take Judicial Notice

¶ 14 During the trial, respondent requested the trial court to read to the jury the following purported judicial admissions by the State and to instruct the jury to "accept [them] as conclusive." Ill. R. Evid. 201(g) (eff. Jan. 1, 2011):

"(a) Respondent has decided to change his desire for sex since his original commitment as a Sexually Dangerous Person.

(b) Respondent appears to have begun to develop an intervention system to reduce harmful ideation and action on his part.

(c) Respondent has participated in therapeutic groups designed to address his mental disorder and criminal propensities to commit sex offenses or molestation of children.

(d) Respondent has encouraged other sex offenders in their recovery.

(e) Respondent is more aware of his own behaviors and triggers and more sensitive to his effect on others than when he was originally committed as a[ ] [sexually dangerous person]."

¶ 15 Respondent represented to the trial court that the State had made these purported judicial admissions by admitting certain allegations in his recovery application. When the court, however, compared each purported judicial admission to what respondent identified as the corresponding paragraph of his application, the court found that the two did not match: in its language, the purported judicial admission significantly diverged from the corresponding paragraph in the application. Consequently, the court declined to publish paragraphs (b) to (e), quoted above. Given that ruling, respondent withdrew paragraph (a).

¶ 16                         C. The Jury Trial (October 2013)

¶ 17                         1. *The Testimony of Dale Spitler*

¶ 18                         a. His Occupation and Qualifications

¶ 19      Dale Spitler testified he had a master's degree in social work and that he was a licensed clinical social worker.

¶ 20      His first job as a social worker, in the 1970s, was with the Illinois Department of Children and Family Services (DCFS), investigating child abuse. Later, in the 1990s, he developed programs at DCFS for the treatment of children who had sexually offending behaviors.

¶ 21      He subsequently worked for the Illinois Department of Corrections (DOC). Initially, he was a clinical supervisor at Centralia Correctional Center. There, he ran the sex offender groups during the times when a psychologist was unavailable. Then he became a healthcare administrator. His duties in that position included assessing and treating inmates with mental-health problems. The treatment of sex offenders was only part of his job as clinical supervisor and healthcare administrator at DOC.

¶ 22      In 2003, Spitler began working at the Community Resource Center, where the evaluation and treatment of sex offenders was his full-time occupation. He testified:

> "A. My entire duties and responsibilities at Community Resource Center, I went there to set up their sex offender treatment program. And while I was there, I oversaw and provided all of the sex offender assessments and sex offender treatment for the Community Mental Health program.
>
> Q. Roughly what percentage of your duties in that period involved the treatment or evaluation of sex offenders?
>
> A. Probably 90%.
>
> Q. Okay. And what would you estimate to be the total number of hours you spent assessing and treating sex offenders in that period from 2003 to 2010?
>
> A. Probably was somewhere around ten thousand hours.
>
> Q. Okay. Now, part of–could you–was part of your duties in assessing sex offenders, assessing the risk of reoffense?
>
> A. Yes.
>
> Q. Okay. In–and why were you doing that? What role did that play in the program?
>
> A. Primarily assessment and a community mental health, there were two things. Sometimes the local Courts would require an assessment prior to presentencing hearing, so that they would have some idea on whether or not they were going to advise probation or incarceration, or what have you.
>
> The second and probably the most important to me, is the assessment was used to guide what we were going to focus on in the sex offender treatment."

¶ 23      Since December 2011, he had worked at Wexford Health Sources, "perform[ing] evaluations for the sexually dangerous persons program at Big Muddy [Correctional Center (Big Muddy)]." Thus far, at Wexford, he had performed 41 evaluations, in 6 of which he had recommended release. In his entire career as a social worker, he had testified probably 25 to 30 times regarding sex offender assessments.

¶ 24    The trial court found Spitler qualified to offer opinions in the fields of sex offender assessment and treatment.

¶ 25                          b. Respondent's History of Sexual Offenses

¶ 26    On contract with DOC, Wexford assigned Spitler to perform an evaluation of respondent, to assess the risk that he would commit further sex offenses if he were released from civil confinement. In March 2013, for that purpose, Spitler went to Big Muddy and interviewed respondent. Two other evaluators attended the interview: a psychologist, Kristopher Klounch, and a psychiatrist, Jagannathan Sriunivasaraghavan (otherwise known as "Dr. Van").

¶ 27    In addition to interviewing respondent, Spitler and Klounch reviewed treatment files, police reports, court documents, and the psychiatric reports for the commitment. Van likewise reviewed the psychiatric reports. Spitler reviewed the group therapy notes and found no "issues" therein.

¶ 28    Of these documentary materials, the assistant State's Attorney focused on the police reports, asking Spitler why it was important to review them. Spitler answered that the police reports helped him understand respondent's "pattern of offending," including how he found his victims, what types of victims he targeted, and whether he had committed sex offenses while in treatment.

¶ 29    Actually, not only the police reports but respondent's own recollections of his offenses were useful for that purpose. For some of the early offenses, Spitler had no police reports or court documents, and therefore he relied on what respondent told him. In 1967, respondent said, he was convicted of indecent exposure. The conviction was in Adams County. Spitler did not know the ages of the persons to whom respondent exposed himself on this occasion, but by Spitler's understanding, they were under the age of 18. As a result of this offense, respondent was referred to Quincy Mental Health Center for counseling. Spitler did not know if the counseling respondent received there was sex offender treatment.

¶ 30    In 1969, in Adams County, respondent was again convicted of indecent exposure. This time, the treatment was hospitalization in Jacksonville Mental Health Center. Spitler did not review the records of this hospitalization, and therefore he was unable to say what treatment respondent received there.

¶ 31    Respondent afterward moved from Illinois to Maryland, where he committed another offense in 1976. Spitler testified:

> "His explanation to us during the interview on that particular case was that he was–he would drive around the neighborhoods in the evenings in a van, and he would have sexual thoughts and then would masturbate and look for potential victims.
>
> And in '76, he happened to be driving by a park and he saw a lady who was standing at the bottom of a sliding board and her attention was on a young child that was at the top of the sliding board. He pulled the van over to the side, got out, ran over to her while she was standing there, and pulled her pants down and attempted to have sexual intercourse with her. She started screaming and he got up and ran off."

Spitler had read the police report corresponding to this 1976 offense, and he saw no inconsistency between the police report and respondent's description of the offense in his interview at Big Muddy. Respondent said the Maryland court ordered him to undergo sex offender treatment, but Spitler never read the court order.

¶ 32    After being convicted in Maryland, respondent moved to Virginia, where, in 1978, he committed another sex offense, while still on probation. Spitler testified:

> "A. The 1978 incident, he was–he broke into a home. He'd found a house, I believe he was able to get in through the screen, and he got into the house. He went into the bedroom and found a woman asleep in the bedroom. And he was naked and crawled into bed with the woman and attempted to have intercourse with her. She started screaming and he left."

Another thing Spitler recalled was that "when the woman started screaming, [respondent] choked her and ran out."

¶ 33    Spitler had read the police report pertaining to the 1978 incident, and, again, he saw no inconsistency between the police report and what respondent told him in the interview. Respondent told him he received sex offender treatment in Virginia, in the community.

¶ 34    After enrolling in an "aversion therapy program" in the early 1980s, respondent committed another offense in 1983. He was driving around in his van, masturbating. "He stopped, he got out of the van, ejaculated and got back in the van." Initially, he did not think anyone had seen him, but as it turned out, someone had seen him, as he learned when he received a visit from the police.

¶ 35    Shortly thereafter, respondent committed yet another indecent exposure as well as a contact offense. Spitler testified:

> "This time, I believe he was driving past a park. He saw two people in the park. He got out of the van and exposed himself to them.
>
> Q. Okay. Are you aware of yet another incident in 1984, after that?
>
> A. Following that incident, also in 1984, again, I can't recall if he was driving at this point in time, I believe he was, but he saw an eleven year old girl who was walking down the street–and yes, he was driving because I remember he said he pulled the van to the side–he got out, ran over to the girl, pulled down her pants and her panties, and attempted to have sexual intercourse with her. Again, she started screaming and he got up and ran off."

Respondent was sentenced to 15 years' imprisonment in Virginia for the offense against the girl. For approximately nine years, while in prison, he "participated in a pedophile group" and also in a "rapist group."

¶ 36    After his release from the Virginia prison, respondent returned to Illinois, where, in 1996, "he broke into a home and crawled in bed with a sixteen year old girl that he found in the home." He "attempted to have sexual intercourse with her," she screamed, and he fled.

¶ 37    Then, in 1998, he "broke into a home and crawled in bed with a woman that he didn't know and attempted to have sexual intercourse."

¶ 38    On another occasion, he was riding his bicycle down the road when he saw two girls, one of whom was stooping and fixing the tire of her own bicycle. He got off his bicycle, ran up to the girl who was stooping next to her bicycle, and kissed her. The other girl started screaming, and he fled.

¶ 39    In 2000, respondent crawled under a garage door that was partly raised. He went into the house, "looking for sex[,] but he had no particular victim picked out." A man who lived in the house confronted him. Respondent ran out of the house, got on his bicycle, and rode away.

¶ 40    Respondent estimated that, on about 80 different occasions, he peeped through windows of other people's houses, standing outside and masturbating.

¶ 41                              c. The Sex Offender Program at Big Muddy

¶ 42    The sex offender program at Big Muddy was a relapse prevention program—as, in fact, were all sex offender treatment programs in Illinois, because research suggested that relapse prevention was the only approach that "ha[d] any degree of efficacy with recovery and not reoffending."

¶ 43    The relapse prevention program had four phases. The first phase was orientation, in which the participant was informed of the goals of the program and the different treatment groups and was introduced to some of the workbooks.

¶ 44    The second phase was the working phase, in which "a good portion of the treatment [took] place." The treatment consisted mostly of participation in groups, with 8 to 12 people in a group. There was a victim empathy group. There was a discovery group, in which group members discovered their "core issues or core beliefs." There was a cycle group, in which members scrutinized their patterns of offending, breaking down the patterns into parts and considering the thoughts, feelings, and beliefs that accompanied each part.

¶ 45    The third phase was the prerelease phase, which "focuse[d] on control of deviant arousal" and formulating a "relapse prevention plan." Spitler summed up:

> "And here's what the relapse prevention plan is. We have the cycle and we have it broken down into, this happens at this time, and this happens at this time, and this leads to this and leads to that. What the relapse prevention plan does, is it looks at all those pieces and helps the person come up with some way to stop it at each one of those phases."

Those "pieces" had to be carefully identified in the preceding phase, in the cycle group. The efficacy of the relapse prevention plan was directly dependent on the quality of the cycle analysis. Spitler explained:

> "[T]he cycle has to be completed before you can have any type of accurate relapse prevention plan. You have to understand all of the pieces from the beginning. What—what triggered certain thoughts, what triggered certain feelings, like I had mentioned before. *** And it's important that every piece be *** explicit because the idea is that the more that you can make these pieces distinct, the more that you can put in an intervention at each single one of those."

¶ 46    The fourth phase was aftercare, which began after the person was released from confinement.

¶ 47                              d. Respondent's Progress in the Treatment Program

¶ 48    Respondent currently was in the second phase of the treatment program, in the working cycle. He had not yet reached the third phase, the prerelease phase. To advance to the third phase, he had to break down his cycle of offending, and he had not done that—as Spitler had perceived from interviewing him.

¶ 49    When interviewing persons adjudged to be sexually dangerous, Spitler always asked them about their cycle. So, he asked respondent to describe his cycle. Spitler testified:

- 7 -

"Basically, what was said to me is ['T]he cycle starts when I start having sexual thoughts. I have sexual thoughts, and then I use pornography and I masturbate and I look for a victim.['] And I asked him, ['A]t that point in time, what other kinds of things are you thinking at these various stages?['] And he basically said that ['W]hat happens is, that I get the urge, I can't control it, and I don't think about any of these other things.[']

Q. Was he able to bring his cycle down explicitly like you described?

A. No."

¶ 50    Although respondent was able to identify a number of core issues–"fear of women, women who [were] in authority, homophobia, the need to feel strong and self-esteem"–he could not relate any of those core issues to his cycle. The assistant State's Attorney asked Spitler:

"Q. In fact, did he state, 'I haven't really figured out how to resolve core issues?'

A. Yes.

Q. Okay. And when asked how his core issues relate to his offending behavior, was his response, '[I]t doesn't really matter, I'm already aroused?'

A. Yes.

Q. What does that tell you about his progress [as a] recovering sex offender?

A. Well again, it says to me that for him, and this happens a lot with certain types of behavior, that they feel that the behavior just happens. They don't see a beginning, a middle or an end to[ ] it. It just happens.

Q. And it–okay. Is that inconsistent with recovery then?

A. Yes."

¶ 51    On the basis of his interview of respondent and his review of the documentation, Spitler gave the following four opinions in his testimony. First, respondent currently was incapable of devising effective relapse prevention techniques. Second, no form of conditional release would allow him to safely manage his behavior. Third, he had a propensity to commit sex offenses, including offenses against children. Fourth, there was a substantial probability he would commit further sex offenses if he were released.

¶ 52                            2. *The Testimony of Thomas Walton*
¶ 53                    a. The Houses on Arden Drive and Alton Drive in Champaign
¶ 54    Thomas Walton testified that, in 2000, when he was a detective with the Champaign police department, he received a report that an intruder had entered a house on Arden Drive. The investigation led to respondent as a possible culprit. In August 2000, Walton and a couple of other police officers went to respondent's apartment and questioned him.

¶ 55    Respondent admitted to them he was indeed the person who had entered the house on Arden Drive. He said he had been bicycling through the neighborhood when he noticed that the garage door at this house was raised partway. He laid his bicycle down some distance from the house, and even though he knew no one at that address, he crawled in, under the garage door, and entered the living quarters. Everyone in the house appeared to be sleeping. He opened a bedroom door, and a man sprang out of bed and asked him what he was doing. Respondent fled, going out the way he had entered. He climbed on his bicycle and took off down the street.

¶ 56    Respondent said that, next, he stopped at a house on Alton Drive. He did not know anyone there, either. Nevertheless, he entered the house. A dog began growling, whereupon he walked out of the house, got back on his bicycle, and rode away.

¶ 57    As Walton testified, recounting what respondent had told him, "[respondent's] intent *** had crystallized, and in his mind, he wanted to have sex with the man [who had] confronted him in the house on Arden Drive." So, respondent returned to the house on Arden Drive, went in, and told the man he wanted to have sex. According to the man's report to the police, that is exactly what the intruder told him upon returning: that he wanted to have sex.

¶ 58    Respondent explained to Walton that he was fighting an overwhelming, irresistible compulsion to have sex, a compulsion which caused him to stand outside people's houses, peering into windows and masturbating, and which even took him inside their houses. He said he preferred girls who were 9 to 13 years old. He longed to hold them, kiss them, cuddle with them, and have sex with them.

¶ 59    He had done window-peeping in the Champaign/Urbana area more times than he could estimate. Not only that, but more than once every six months, he actually entered people's residences without their knowledge. He hoped that by surreptitiously entering residences, he eventually would find a young girl who was willing to have sex with him.

¶ 60                         b. Incidents in Urbana

¶ 61    Respondent divulged to Walton and his colleagues that, in addition to the foregoing incidents in Champaign, there had been some incidents in Urbana. He accompanied some police officers to Urbana and pointed out to them the houses.

¶ 62    One house was on Mumford Drive. Respondent said that, during the past few months, he was outside that house many times, masturbating. He said he also entered that house on at least three occasions.

¶ 63    Another house was on East Colorado Avenue. Respondent said that, a couple of years ago, he entered that house and found a girl, 11 or 12 years old, in bed, sleeping. He said he masturbated in her presence and that when he tried to kiss her, she woke up and began screaming.

¶ 64    After respondent recounted an incident such as this, Walton would follow up by looking for a corresponding police report. As it turned out–judging from one of these police reports–respondent left out something significant that he did in the house on East Colorado Street. As he admitted when Walton pressed him in a subsequent interview, he choked the girl before fleeing out the window of her bedroom. He put his hands around her throat and stifled her scream.

¶ 65    When Walton began really probing down and talking with respondent about the emotional trauma this young girl undoubtedly suffered and how she would have been in terror for her life, respondent showed some signs of remorse. He never actually expressed regret, however, and he never took responsibility for any specific acts of wrongdoing.

¶ 66    Although respondent at first edited out the choking and, for that reason, Walton was less than confident about his candor, respondent otherwise appeared to be forthright in confessing to sex offenses in which, apparently, he had not yet been implicated. He told Walton about another incident when he was bicycling in Urbana and encountered two girls in the vicinity of George Huff Drive and Race Street. One of the girls–nine years old according to the police

report–was kneeling beside her bicycle. He dismounted from his bicycle, took her face in his hands, and kissed her on the mouth. He added that, on several occasions thereafter, he masturbated while remembering this incident.

¶ 67                              c. The Stripper's Apartment

¶ 68    Respondent told Walton he met a stripper at the Silver Bullet and that she resided in his apartment complex. He said he entered her apartment one time, when she was not home, and that he stayed for a few minutes. All he did was touch her bed.

¶ 69                              d. Trips Elsewhere

¶ 70    As respondent told Walton in one of the interviews, there were times when he loaded his bicycle into the trunk of his car and took trips to Indianapolis, Indiana, and Springfield, Illinois. Upon arrival, he would park his car, take his bicycle out of the trunk, and use the same " [']modus operandi['] ": the disarming spectacle of an older gentleman in a bicycle helmet, pedaling through the neighborhood.

¶ 71    It was Walton's impression that respondent knew, quite clearly, that he had a problem. Respondent thought it might help if he got rid of the bicycle.

¶ 72                              3. *The Testimony of Jessica Stover*

¶ 73                              a. Her Occupation and Qualifications

¶ 74    Jessica Stover testified she was a social worker IV with DOC and that her assignment was to provide treatment to persons whom the State had civilly committed as sexually dangerous.

¶ 75    All such persons, including respondent, were confined at Big Muddy. Stover presided over therapy groups there. She was a "facilitator."

¶ 76    Her qualifications to do this kind of work were as follows. She had a master's degree in social work, a field in which she had been working since 2004. From 2004 to 2008, she was a licensed social worker. From 2008 to the present, she was a licensed *clinical* social worker. She also was approved as a treatment provider and an evaluator for sex offenders. See 225 ILCS 109/35 (West 2012) (qualifications for licensure by the Department of Financial and Professional Regulation as a sex offender evaluator and sex offender treatment provider). She had been working with sex offenders since 2006, first in the "community setting" and then for DOC. She had done over 20 sex offender evaluations for the court and over 20 sex offender evaluations for Big Muddy. At least 10 times, she had testified as an expert in the field of sex offender treatment and evaluation.

¶ 77    Over respondent's objection, the trial court found Stover sufficiently qualified to testify as an expert in the fields of sex offender treatment and evaluation and to give testimony in the form of opinions in those fields.

¶ 78                              b. Her Description of the Treatment Program at Big Muddy

¶ 79    The treatment program at Big Muddy consisted primarily of group therapy, of which there were three phases. (The fourth phase of treatment, called "aftercare," was not group therapy.)

¶ 80    The first phase was orientation, the goals of which were to inform the participants of what they could expect from treatment and to lead them to accept responsibility for their offenses.

¶ 81 The second phase contained most of the treatment, and this phase included an exercise called "cycling." The participant chose an offense and put together a cycle or timeline of the offense, starting two weeks before the offense and describing various events on that timeline: thoughts, feelings, and behaviors. The hope was that, in dissecting the process that had taken the participant from two weeks before the offense to a short time after the offense, he or she would begin recognizing the patterns in his or her offending behavior: the deviancies, the inadequately managed stressors, and the beliefs leading or enabling the participant to commit sexual offenses against others. Also in the second phase, the participant was expected to learn empathy: not merely to coldly and intellectually understand the trauma he or she had inflicted on the victim, but to have an emotional experience of empathy–to genuinely feel remorse, remorse for hurting the victim as well as people associated with the victim.

¶ 82 The third phase was the relapse prevention phase. In this phase, the object was for the participant to learn interventions, or ways to avoid offending. To really benefit from the third phase, the participant had to successfully complete the second phase (although, to some extent, the second phase likewise addressed interventions). It would be difficult for the participant to devise interventions unless the participant first had a solid understanding of his or her cycle or pattern of offending, the distortions of thought and belief that led him or her to make the decision to offend.

### c. Respondent's Progress in the Treatment Program

¶ 84 Stover testified she had been providing treatment to respondent for the last three years. He had been participating in therapy groups, which met once a week. He currently was in the empathy group, which she was facilitating.

¶ 85 Until September 2013, the month before the trial, respondent was in the cycle group, which Stover also facilitated, but that group was finished for now: the participants had presented their cycles to the other group members and the facilitator. After hearing respondent's presentation of his cycle, Stover had concluded he was not yet ready for the third phase–even though previously, in periodic reports, staff members gave him high marks in many areas, such as attendance, motivation, commitment, offense disclosure, identifying deviant arousal, regulating arousal, accepting responsibility, and decreasing criminal behavior and exploitation.

¶ 86 Respondent's presentation of his cycle, in September 2013, caused Stover to revise downward her assessment of his progress. The cycle appears to be the final exam, so to speak, in phase II. Respondent chose, as the subject of his presentation, a sexual offense he had committed against a girl named T., an offense of which he was convicted in 1984. Because he was quite detailed about certain things, he evidently had no memory problem; he had no trouble remembering the incident. He began describing his cycle in vivid detail: how he deceived his probation officer by paying the probation fee several months in advance and telling her whatever she wanted to hear so that she would think he was a good guy and would be easy on him; how, upon his release from prison, things were going pretty well for him in that he had a job and a car and he was in a sexual relationship with an adult woman; how he almost was late for work because he wanted to go down one more street in the hope of finding a woman or young girl to whom he could expose himself; how he found T. out walking; how he circled back around the block, parked the car, and took his pants off in the car; how he hoped he would find her where he last saw her and that she would be as beautiful as she first appeared

to be; how he walked up to her and committed the offense; and how he then ran away, got back in his car, put his pants on, and went to work as if nothing had happened, other than he was running a little late, as usual. Stover testified:

"[He was] [v]ery detailed in certain aspects of his offense.

However, in the buildup stages of his offense, he omitted any deviancy that was going on, any fantasies, any sexual arousal that he was having. At several points in the cycle, myself and the other group members would question him about this and he continued to very much minimize it, to devalue the importance of it. He would make statements that it was always there. So if he would put it into a cycle, he would be rewriting the same thing over and over again.

After several weeks of this, [respondent] then came to group with one event that he was going to add to his cycle. And so we read the event, and it was the on-going deviancy. But he just asked that we, as a group, go ahead and plug that into the individual events instead of him, himself, taking responsibility and including those in. There were also parts in his cycle where he would be very detailed, about the clothing that his victim [T.] was wearing. But when we, as a group, would ask about the trauma, the pain that was evidenced from the offense itself, he would state that, well, it was so many years ago, he can't remember the details. But yet, continued providing very specific details in other parts of his cycle.

***

*** [W]hen we asked about [T.], herself, [respondent] was very cutoff [*sic*] from–from her pain, her suffering. He couldn't recall if she had tried to fight him off. He could not recall if she was screaming for help when the offense happened. ***

Some statements he made was, ['W]ell, that's where I was then. You know, I–I don't know now what she's going through because I don't know her now.['] And so when we would try to explore with him that empathy is putting yourself in the other person's position and what do you think they're suffering is, he was very resistant to exploring that possibility."

He did not, or would not, understand how being flashed could be traumatic for a child, although he could intellectually (as distinct from emotionally) understand a possible long-term effect in that the child, when she was grown and had become a mother herself, could be in continual fear for her own child.

¶ 87    According to Stover, respondent also was "very resistant to talking about his core issues." He had "identified his core issues as homophobia, fear of women, women in authority, a need to be tough[,] and [low] self-esteem." He did not display any insight, however, into how those core issues led to his sexual misbehavior, other than that "he believed he had to have sex with women so he would not think he was gay." Stover testified:

"[W]hen he was presenting the cycle, somebody in the cycle group asked [respondent] if he had issues with women, if that was a core issue. And [respondent's] replay [*sic*] was, ['O]f course I do.['] And when we followed that up with, ['W]hat are those issues with women[?'] he–he was very resistive. That indicated that he didn't know. When we followed up, ['W]ell, then why did you agree that [you] had women issues[?'] his reply was, ['B]ecause you guys are telling me I do.['] So very resistive in seeing how different things play into his own life or his own belief system, and very quick at

different times to just agree with what myself or the group said. But then is unable to–to explain that."

¶ 88    Instead of regarding his sexual offenses as proceeding from his own thought distortions and blameworthy choices, respondent tended to blame some version of fate. At different points when he was presenting his cycle, he "downplay[ed] his responsibility" by saying something to the effect of " ['it just came over me,['] " "describing the deviancy as something outside of him, something that ha[d] control over him rather *** than something that he [could] control in himself." By way of illustration, Stover testified:

"A. There have been several times recently in the victim empathy group where [respondent] will bring a story or a news report that he's either heard on the radio or seen on [television], he'll bring those situations to group. One of the recent ones he came to group with several months ago, he had heard a radio program where there was a young woman who was describing that she–she never felt comfortable with herself, always believed herself to be a man. And had actually progressed to the point where she was starting to take treatment to develop into more of a man, which she felt more comfortable with. She began taking testosterone injections. [Respondent] started describing this story of this young woman and saying that when she began receiving the testosterone injections, she started noticing herself, objectifying women, noticing women's body parts and really struggling with what she felt was inappropriate.

[Respondent] connected to that in saying, more or less, that possibly his deviancy is due to an increased level of testosterone in his own body. This individual, I believe, also indicated that she had Native American ancestry. And [respondent] connected to that as well, stating his mother had Native American ancestry and his mother always believed that it was that ancestry that led to his deviancy."

¶ 89    In a word, respondent tended to think of himself as being acted upon rather than acting. Thus, in Stover's opinion, if respondent were released from civil confinement, he would have difficulty controlling his behavior, because he did not yet understand where that behavior came from. He did not yet understand "the thinking distortions, the core issues that fuel[ed] the belief system [whereby it was] okay to sexually offend against somebody else." Without such an understanding, it was "very difficult, if not impossible, to then learn the appropriate interventions *** to deter him from sex offending."

¶ 90    Respondent's intended strategy of "avoid and escape," that is, simply avoiding women and children, was "one useful intervention"; but it was not enough, considering that, outside Big Muddy, it would be impossible for him to totally avoid women and children. He also put a lot of stock in Buddhist chanting, but, for him, this was merely another form of avoid and escape.

¶ 91    Stover summed up:

"A. [Respondent] currently displays difficulty in controlling fantasies, flash fantasies. He has difficulty identifying [and] using appropriate interventions, other than avoid and escape, in–in minimizing and reducing the intensity of these fantasies.

Q. In your expert opinion, if [respondent] is released, is it substantially probable that he will engage in the commission of sex offenses if the future?

A. It is my opinion, that yes.

Q. And why?

A. [Respondent] is in a restricted setting currently, a setting where he has limited contact with females. He has limited ability in regards to movement, opportunities to offend. [He] still struggles, very much so, with flash fantasies, with deviant thoughts, with objectifying women and children. In the setting that he's in right now, it is difficult for him to go past the point of objectifying. It's my opinion that at this time he does not have the skills, that if he were in a community setting where if he would have more opportunity and fewer restrictions, that he would have the appropriate skills to deter him from future recidivism."

¶ 92                          4. *The Testimony of Jagannathan Sriunivasaraghavan*

¶ 93                            a. His Occupation and Qualifications

¶ 94     Jagannathan Sriunivasaraghavan, who, again, went by the shortened surname "Dr. Van," testified that he was a forensic psychiatrist. He had been practicing psychiatry since 1980, and he was board certified in both psychiatry and forensic psychiatry. He had been board certified in forensic psychiatry since 1996. He had been working with sex offenders since 1998, mostly doing evaluations of sexually dangerous persons–although he admitted that sex offender evaluation was not of much academic interest to him and that he had published nothing on the subject. He was a professor emeritus at the School of Medicine of Southern Illinois University. For the past 1½ years, he had been doing sex offender release evaluations for Big Muddy, working as a contract psychiatrist from Wexford. It was part-time work.

¶ 95     The trial court found Van to be qualified to testify in the fields of psychiatry and forensic psychiatry and to offer opinions in those fields.

¶ 96                              b. His Evaluation of Respondent

¶ 97     The State had hired Wexford to perform a sex offender release evaluation of respondent, and Van was one of a team of three evaluators from Wexford assigned to perform this evaluation. The other two evaluators were Spitler and Klounch. Each of them wrote a different section of the report. Van wrote the section discussing the psychiatric history, the medical history, the substance-abuse history, the mental status examination, and the diagnoses. Spitler wrote the section discussing the "sex offender treatment, history and compliance and progress." Klounch wrote the section discussing the Static 99R evaluation and the dynamic risk factors.

¶ 98     The report was based in part on an interview of respondent. The three of them–Van, Spitler, and Klounch–met with respondent and interviewed him for three hours. This was the first time Van ever met respondent. The three evaluators also met with the treatment providers at Big Muddy, including Stover. Van reviewed the following documents: the two evaluations originally concluding that respondent was a sexually dangerous person, an evaluation from 2009, and some police reports. According to Van, "each of these sources of information [was] typically and reasonably relied upon in [his] field in forming an expert opinion." He did not recall reviewing the evaluation from 2005.

¶ 99     On the basis of his interview of respondent and his review of the documentation, Van gave six opinions in his testimony. First, respondent suffered from pedophilia, sexually attracted to females, nonexclusive type; exhibitionism; voyeurism; and alcohol dependence, and he had been suffering from these mental disorders for well over a decade. Second, respondent's

mental disorders gave him a propensity to commit sex offenses. Third, aversion therapy and religious practice would be insufficient in themselves to prevent him from committing further sex offenses. Fourth, his mental disorders caused him serious difficulty in controlling his behavior. Fifth, it was substantially probable that if he were released from confinement, he would commit further sex offenses. Sixth, no set of conditions would allow him to be safely released into the community at this time.

¶ 100                              5. *The Testimony of Kristopher Klounch*

¶ 101                              a. His Occupation and Qualifications

¶ 102    Kristopher Klounch testified he was a clinical psychologist. He had a master's degree and a Ph.D. in clinical psychology. The title of his dissertation was " ['S]ex [O]ffender [A]ssessment[:] [C]linical [U]tility and [P]redictability.['] " From 2004 to 2007, he was a psychometrist for the "Missouri Sex Offender program," doing actuarial psychological assessments of incoming sex offenders: 40 to 50 assessments a month, for a total of about 1,700 assessments during the three-year period. Afterward, for several years, he did various psychological assessments for different employers, including but not limited to sex offender assessments. Finally, in 2012, he began working for Wexford, and the only thing he did there was "complete evaluations for the sexually dangerous persons program," including "assessing the risk of reoffense."

¶ 103    The trial court found Klounch to be qualified as an expert in the fields of sex offender assessment and treatment.

¶ 104                              b. His Evaluation of Respondent

¶ 105    Klouch testified: "We interviewed [respondent] on March 28th, 2013. And we completed our report for April 26th, 2013." In the interview, respondent estimated he had exposed himself to 70 to 80 people. He "indicated that two days prior to the evaluation he had a sexual fantasy about a fourteen year old." Klounch diagnosed respondent as suffering from the following mental disorders: pedophilia, exhibitionism, and voyeurism.

¶ 106    Before interviewing respondent, Klounch and the other evaluators reviewed police reports, prior evaluations done by two doctors named Traugott and Jeckyll, and a recovery evaluation from 2009. Klounch admitted, on cross-examination, that he had not reviewed police reports for every offense that respondent had recounted. Nor had he read all the case notes by treatment providers. Nor had he reviewed the assessment from 2005. On redirect examination, however, he testified that further police reports would not have changed the results of the Static 99R.

¶ 107    The Static 99R was an actuarial instrument designed to assess the risk of reoffense. It was comparable to an insurance company's assessment of the risk that someone would have an accident. "[C]ertain variables [had] been shown to be predictive of future reoffense for sex offenders." The Static 99R "put [those variables] into a measure and scored [them] accordingly." The instrument was named "Static" because it "measure[d] static risk factors," factors that were "not ultimately going to change anytime in the future." The letter "R" signified that the instrument was a revised version. According to Klounch, the Static 99R was "reasonably relied upon in [his] field in forming an expert opinion as to whether someone [would] reoffend."

¶ 108    Klounch testified that respondent scored seven on the Static 99R. The assistant State's Attorney asked Klounch:

> "Q. And what does that mean?
>
> A. It places [respondent] in the high risk category. And research has shown that individuals that have the same score as [respondent] have reoffended at 5.25 times the rate of the average sex offender.
>
> Q. Now, this score of seven on this measure, would have been much high[er] if not for his age. Is that correct?
>
> A. Yes, it would.
>
> Q. And what would his score have been had it not been for his age?
>
> A. If he was under the age of sixty, it would have been a score of ten.
>
> Q. Is there any age adjustment that occurs after age sixty on the Static 99R?
>
> A. No, there is not.
>
> Q. Is there–okay. So there's no statistic[al] reduction in risk with age, after that–after age sixty, according to the Static 99R?
>
> A. No, there is not."

At the time of his recovery evaluation in 2009, respondent "would have been 58 [years old]," and consequently his score on the Static 99R "would have been two points higher."

¶ 109    In addition to considering static risk factors via the Static 99R, Klounch considered dynamic risk factors, factors which could change and which, statistically, had been shown to enhance the risk of reoffense. Klounch found six dynamic risk factors applicable to respondent: (1) sexual preoccupation; (2) a sexual preference for children; (3) multiple paraphilias, or multiple sexually deviant behaviors, *i.e.*, pedophilia, exhibitionism, and voyeurism; (4) offense-supported attitudes, *i.e.*, that "women [were] sexual objects" who did not "communicate appropriately with men" and that "children [were] sexual beings"; (5) a lack of emotionally intimate relationships with adults; and (6) resistance to rules and supervision.

¶ 110    On cross-examination, Klounch acknowledged that, from 1978 to 1982, respondent dated a woman named Penny and that they had a sexual relationship, as noted in the Wexford report. Klounch explained:

> "A. Well, we knew about that relationship. It was really, that factor has a lot to do with actual marriage. And then also it would be living with the partner as well. So the long–he indicated that he did not live with that partner, it wasn't like they shared a residence. He would spend the night at her home, if I recall, but there was nothing further than that. So there wasn't that type of marital, cohabitation type relationship."

¶ 111    Likewise, on cross-examination, Klounch admitted that, since 2009, respondent "ha[d] been in no trouble on the unit and ha[d] received no disciplinary tickets." On redirect examination, however, Klounch clarified that "all of [respondent's] problems in following rules in the past ha[d] related specifically to sexual behavior."

¶ 112    In Klounch's opinion, respondent's mental disorders gave him a propensity to commit sex offenses, he had serious difficulty controlling his sexual behaviors, there was a substantial probability he would commit further sex offenses if he were released from confinement, and no conditions would enable him to be safely released into the community.

¶ 113    After the State rested, respondent moved for a directed verdict. The trial court denied the motion.

¶ 114    The jury found that respondent still was a sexually dangerous person.

¶ 115    The trial court subsequently denied respondent's motion for a new trial.

¶ 116    This appeal followed.

¶ 117                                    II. ANALYSIS

¶ 118               A. The Denial of Paragraph 4 of Respondent's Motion *in Limine*

¶ 119    Respondent claims the trial court "erred" by denying paragraph 4 of his motion *in limine*, thereby "allowing the jury to be told that [he] was found to remain a sexually dangerous person in 2009."

¶ 120    Once respondent makes that claim, the very next question is, What is our standard of review when we review the denial of a motion *in limine*? Respondent does not say. See Ill. S. Ct. R. 341(h)(3) (eff. Feb. 6, 2013) ("The appellant must include a concise statement of the applicable standard of review for each issue, with citation to authority, either in the discussion of the issue in the argument or under a separate heading placed before the discussion in the argument."). That omission is a mistake because respondent's task is to convince us that our standard of review obliges us to find error in the denial of his motion *in limine*. Leaving out the standard of review is not the ideal way to go about that task.

¶ 121    We ask whether the denial of paragraph 4 of the motion *in limine* was an abuse of discretion. See *Noble v. Earle M. Jorgensen Co.*, 2013 IL App (5th) 120248, ¶ 21. This is the most deferential standard of review recognized by law. *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 39. Our mere disagreement with the trial court's decision would not be enough to make the decision an abuse of discretion. *Id.* Rather, the trial court abused its discretion only if the court "acted arbitrarily, exceeded the bounds of reason, or ignored or misapprehended the law." *Id.*

¶ 122    Respondent argues that, by denying paragraph 4 of his motion *in limine*, the trial court violated the rule that only relevant evidence is admissible (Ill. R. Evid. 402 (eff. Jan. 1, 2011)). Before addressing that argument (within the context of our deferential standard of review), we need to clarify exactly what argument we understand respondent to be making. We do not understand him to be challenging an evidentiary ruling in the trial itself. We do not understand him to be challenging the overruling of an objection he made during the testimony of a witness. In his argument, he does not discuss any objection and the ruling thereon; nor does he cite any page of the trial transcript where he objected. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) ("Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."). Instead, we understand him to be challenging the pretrial ruling on paragraph 4 of his motion *in limine*–and nothing more.

¶ 123    With the issue thus circumscribed, we have even greater difficulty finding an abuse of discretion. If the ruling is only provisional and made "in a vacuum" (*Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 205 (1992)), it is difficult to condemn it as arbitrary and unreasonable. No actual prejudice is inflicted by the denial of a motion *in limine*, in itself, because the ruling "is always subject to reconsideration during trial." *People v. Drum*, 321 Ill. App. 3d 1005, 1008 (2001). Perhaps that is why the supreme court has held: "The denial of a motion *in limine* does not in itself preserve an objection to disputed evidence that is

introduced later at trial. When a motion *in limine* is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review." (Internal quotation marks omitted.) *Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002). In other words, for appellate purposes, the denial of a motion *in limine* is a nonevent, considering that the motion serves merely as the preview of an objection that must be made during the trial, in response to some particular evidence that the opposing party offers.

¶ 124    In our review of the trial transcript, we do not see where respondent made any objection to evidence that, in 2009, he was found to remain a sexually dangerous person. Even so, the State does not raise forfeiture resulting from the lack of a contemporaneous objection. "[B]ecause forfeiture is in the nature of an affirmative defense that the State may either raise, waive, or forfeit [citation] the forfeiture argument is itself forfeited." (Internal quotation marks omitted.) *People v. Beachem*, 229 Ill. 2d 237, 241 n.2 (2008).

¶ 125    Consequently, we will consider whether the denial of paragraph 4 of respondent's motion *in limine* was, in itself, an abuse of discretion. Considering that the trial court made its decision outside any evidentiary context and with the awareness that it was doing nothing irrevocable (see *Drum*, 321 Ill. App. 3d at 1008), we are unable to say that the denial of paragraph 4 of the motion *in limine* was arbitrary or unreasonable (see *Cholipski*, 2014 IL App (1st) 132842, ¶ 39). The court might have foreseen the possibility that, in the trial, respondent would present evidence of his recovery years ago: evidence that in, say, 2008, he began feeling genuine empathy for his victims and that he no longer was a sexually dangerous person as of that time. Such evidence would tend to make it "less probable" that he currently was a sexually dangerous person. Ill. R. Evid. 401 (eff. Jan. 1, 2011). In all fairness, the State would have the right to respond with evidence that, in 2009, he was judicially found to remain a sexually dangerous person. See *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 50. At a minimum, such evidence would be relevant as rebuttal, and the court could reasonably decline to impose a blanket interdiction that might later be problematic if the need for such rebuttal arose.

¶ 126    Alternatively, respondent argues that, even if the 2009 decision were relevant, "its probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Quoting *People v. Walker*, 211 Ill. 2d 317, 331 (2004), he compares the 2009 decision to a prior conviction in a criminal case, which, the supreme court said, "will generally present a danger of unfair prejudice because this evidence has the capacity to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." (Internal quotation marks omitted.) In this passage from *Walker*, however, the supreme court was concerned that evidence of a prior conviction would lure the jury into finding the defendant guilty of committing the charged offense because it perceived him or her as having the propensity to commit crime. *Id.* Respondent attempts to analogize that concern to a significantly different context, a recovery proceeding, a civil proceeding, in which the ultimate issue is the respondent's psychological status, including his "propensities" (see 725 ILCS 205/1.01 (West 2012)), instead of whether he committed a yet-to-be-proved offense. In a criminal case, propensity evidence is "[e]vidence of other crimes, wrongs, or acts" offered to "prove the character of a person in order to show action in conformity therewith" on a particular occasion. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). By contrast, in the present civil proceeding, the 2009 decision was not evidence of a crime, wrong, or act by respondent; nor did the State intend to

offer the 2009 decision as proof that respondent committed another wrongful act on a particular occasion. Rather, the State intended to offer the 2009 decision as evidence that, if respondent recovered at all, the recovery would have had to occur sometime after the 2009 decision, not before.

¶ 127 The trial court did not have to conclude that, by offering the 2009 decision for that purpose, the State would cause a "confusion of the issues." Ill. R. Evid. 403 (eff. Jan. 1, 2011). The instructions plainly required the jury to presume that (since 2009) respondent had recovered, and the instructions placed the burden on the State to rebut that presumption by clear and convincing evidence. The trial court instructed the jury:

> "*The Respondent is presumed to have recovered and to no longer be a sexually dangerous person*. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced by clear and convincing evidence that the Respondent *is still* a sexually dangerous person.
>
> The State has the burden of proving the Respondent *is still* a sexually dangerous person by clear and convincing evidence, and this burden remains on the State throughout the case. The Respondent is not required to prove he has recovered." (Emphases added.)

Thus, there should have been no confusion of the issues. Although the jury had heard evidence that respondent was judicially found to remain a sexually dangerous person in 2009, the trial court instructed the jury to presume he had recovered–meaning, logically, that he had recovered since 2009–and the court further instructed the jury that this presumption was to prevail unless the State had proved, by clear and convincing evidence, that respondent was "still," presently, a sexually dangerous person.

¶ 128 In sum, we are unconvinced that the denial of paragraph 4 of respondent's motion *in limine* was in itself an abuse of discretion.

¶ 129 B. Refusing To Publish So-Called "Judicial Admissions"

¶ 130 Respondent requested the trial court to read to the jury purported judicial admissions the State had made in its answer to his recovery application. When the court, however, compared the purported judicial admissions to what respondent identified as the corresponding paragraphs of his application, the court found that the judicial admissions significantly departed, in their language, from the paragraphs of the application that the State had admitted. For that reason, the court denied respondent's request.

¶ 131 In his argument, respondent fails to interact with, or even acknowledge, this rationale by the trial court. Because he gives us no reason to gainsay the court's rationale, we will accept that rationale as correct.

¶ 132 The trial court is correct for an additional reason: in order for a statement to qualify as a judicial admission, it must be a party's "statement *** about a concrete fact within that party's peculiar knowledge." (Internal quotation marks omitted.) *In re Marriage of Smith*, 265 Ill. App. 3d 249, 253 (1994). Inferences, appearances, and opinions do not qualify. *Vincent v. Wesolowski*, 87 Ill. App. 2d 477, 480 (1967); *Huber v. Black & White Cab Co.*, 18 Ill. App. 2d 186, 190 (1958). By their own terms, the statements that respondent offered as judicial admissions drew inferences as to what had been going on in respondent's mind (what he had

- 19 -

decided and what he was aware of), or they stated what "appear[ed]" to be the case, or they concerned matters of which respondent also would have knowledge as opposed to matters within the State's peculiar knowledge. Consequently, in our *de novo* review of this issue (*Herman v. Power Maintenance & Constructors, LLC*, 388 Ill. App. 3d 352, 360 (2009))–a standard of review which, by the way, respondent likewise neglects to identify (see Ill. S. Ct. R. 341(h)(3) (eff. Feb. 6, 2013))–we find no error in the trial court's refusal to take judicial notice of the purported judicial admissions.

¶ 133                    C. The Denial of the Motion for a Directed Verdict
¶ 134                    1. *The High Standard for Directing a Verdict*
¶ 135          Respondent contends that the trial court erred by denying his motion for a directed verdict.

¶ 136          As respondent says, a court should grant such a motion only if all the evidence, regarded in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could possibly stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). Because our standard of review is *de novo* when we review the ruling on a motion for a directed verdict (*Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 18), we likewise view the evidence in the light most favorable to the nonmovant (see *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011) ("A *de novo* review entails performing the same analysis a trial court would perform.")). This means that, instead of deciding for ourselves how credible a witness is and instead of deciding for ourselves which evidence to believe or disbelieve (*Maple v. Gustafson*, 151 Ill. 2d 445, 452 (1992)), we construe the evidence in a way that supports the nonmovant's case, and we draw inferences in the nonmovant's favor insomuch as it would be reasonably defensible to do so (*Hamilton v. Hastings*, 2014 IL App (4th) 131021, ¶ 22).

¶ 137          If all we can say is that, given the conflicting evidence, the opposite verdict would have been more reasonable, we should affirm the denial of the motion for a directed verdict. *Id.* A trial court should direct a verdict only if it finds "a total failure or lack of evidence to prove any necessary element of the plaintiff's case." *Perfetti v. Marion County, Illinois*, 2013 IL App (5th) 110489, ¶ 15. If, instead of being presented with no evidence whatsoever to support an element of the plaintiff's *prima facie* case, the jury has to choose among conflicting pieces of evidence, some of which support the element and others of which undermine the element, the trial court should deny the motion for a directed verdict, and we should affirm the denial. *Hamilton*, 2014 IL App (4th) 131021, ¶ 23.

¶ 138                    2. *The Elements of the State's Prima Facie Case*
¶ 139          Section 9(a) of the Sexually Dangerous Persons Act (725 ILCS 205/9(a) (West 2012)) provides: "An application in writing setting forth facts showing that such sexually dangerous person or criminal sexual psychopathic person has recovered may be filed before the committing court." In a hearing on the application, "[t]he sexually dangerous person or the State may elect to have the hearing before a jury," and "[t]he State has the burden of proving by clear and convincing evidence that the applicant is still a sexually dangerous person." 725 ILCS 205/9(b) (West 2012).

¶ 140          Thus, the State has the burden of proving, by clear and convincing evidence, that the civilly committed person, the respondent, still meets the statutory definition of a "sexually dangerous person." *Id.* That statutory definition has the following four elements, which are the elements

of the State's *prima facie* case. First, the respondent suffers from a mental disorder. Second, the respondent has suffered from the mental disorder for a year or longer. Third, the mental disorder is accompanied by criminal propensities to the commission of sex offenses. Fourth, the respondent has demonstrated propensities toward acts of sexual assault or acts of sexual molestation of "children" (meaning any person under the age of 18 (*People v. Beksel*, 125 Ill. App. 2d 322, 329 (1970))). 725 ILCS 205/1.01 (West 2012); *People v. Burns*, 209 Ill. 2d 551, 553 (2004).

¶ 141 We may overturn the denial of respondent's motion for a directed verdict only if we find, in our *de novo* review, "a total failure or lack of evidence" to prove any of these four elements of the State's *prima facie* case. *Perfetti*, 2013 IL App (5th) 110489, ¶ 15.

¶ 142                 3. *Respondent's Argument That the State's Witnesses Lack Credibility*

¶ 143 Respondent argues:

> "While Spitler, Stover, Dr. Van, and Klounch all said the magic words, their bases for doing so were formulaic. Spitler testified at length about [respondent's] decade-and-more-old criminal history but [h]ad nothing credible to say about so-called sex offender treatment he received before 2000, and his contact with [respondent] lasted a sum total of 3 hours, during which he found him to be truthful and cooperative. Stover testified about an evaluation process that falls just short of risible. Metrics change from evaluation to evaluation. Offenders are subjectively evaluated by different people. Evaluations vary like sine waves."

¶ 144 It is unclear why respondent regards the "bases" of the witnesses' testimony as "formulaic," but, essentially, he seems to be suggesting that the bases are unconvincing. In fact, all respondent does in the quoted passage is assert, either explicitly or in so many words, that the witnesses, declared by the trial court to be experts, are unbelievable. Spitler supposedly is unbelievable because he interviewed respondent for only three hours, during which respondent was truthful and cooperative, and because Spitler did not know much about the treatment respondent received before 2000. Stover supposedly is unbelievable because she testified to an evaluation process that is subjective and inconsistent.

¶ 145 Similarly, respondent challenges the credibility of Van and Klounch. He argues:

> "To stay busy in retirement, Dr. Van does evaluations in a field that interested him not at all during his professional career. Mr. Klounch parroted the same opinions as his colleagues, based primarily on an actuarial test that goes to elaborate lengths to conclude that the future is the past; once a sex offender, always a sex offender."

In other words, Van supposedly is unbelievable because he merely dabbles in sex offender evaluation as a lucrative hobby in his retirement and because the subject did not interest him, academically, in his professional career. Klounch supposedly is unbelievable because he relies on the Static 99R, an actuarial instrument, which, in respondent's crude caricature, operates on the principle of "once a sex offender, always a sex offender." So, immediately after warning us in his brief that we must not "re-weigh the *** credibility of the witnesses," respondent turns around and invites us to do just that. We decline the invitation. We must scrupulously refrain from deciding whether the witnesses were credible. See *Maple*, 151 Ill. 2d at 452.

¶ 146                          4. *Conflicting Evidence on How Well*
                         *Respondent Did in Phase II of the Treatment*

¶ 147       Respondent perceives a conflict in the evidence. On the one hand, in periodic written reports, evaluators, including Stover, gave him some good scores during phase II of his treatment. On the other hand, Stover testified to what she regarded as grave deficiencies in respondent's presentation of his cycle. Respondent argues:

> "Even a single evaluator, (namely, Stover), changes her opinions on evaluations wildly as often as every six months. From one side of the Expert Mouth, we hear that [respondent] is making progress over time; the other side tells us that, (coincidentally just before there is to be hearing on his application showing recovery), he is regressing on his road to recovery. ***
>
>      After nearly a decade-and-a-half, the State gave the jury to believe, [respondent]–an intelligent, cooperative, mature man–has, as a captive audience of Big Muddy's programmers, made (a) some progress or (b) some progress but has back-slid dramatically just over the past six months."

¶ 148       Thus, there is an apparent conflict in the evidence. At first, evaluators said in their written reports that respondent was making progress. (It is worth noting, however, that the trial court instructed the jury to regard these written reports not as substantive evidence but only as part of the bases for the expert opinions. But let us assume, for the sake of argument, that they are evidence.) Then, six months later, there was a reassessment, which yielded the conclusion that he had made inadequate progress to graduate to phase III, the prerelease phase. Far from meriting a directed verdict, such a conflict in the evidence precludes a directed verdict. "A trial court is not free to enter a directed verdict *** where *** the determination regarding conflicting evidence is decisive to the outcome." (Internal quotation marks omitted.) *Hamilton*, 2014 IL App (4th) 131021, ¶ 23.

¶ 149              5. *Whether the Verdict Is Against the Manifest Weight of the Evidence*
¶ 150       In a short concluding paragraph of his argument, respondent says that, "[f]or substantially the reasons set forth in the preceding sections [of his brief]," the jury's verdict was against the manifest weight of the evidence and hence the trial court should have granted his motion for a new trial. See *Maple*, 151 Ill. 2d at 454. We have already addressed the reasons set forth in the preceding sections of respondent's brief, and therefore we are unconvinced that the verdict is against the manifest weight of the evidence or that a new trial is merited.

¶ 151                              III. CONCLUSION
¶ 152       For the foregoing reasons, we affirm the trial court's judgment.

¶ 153       Affirmed.