NOTICE

Decision filed 06/12/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 170363-U

NOS. 5-17-0363, 5-17-0364 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | Nos. 15-CF-361, 16-CF-197 |
| | ) | |
| | ) | |
| STEVEN MURPHY, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Welch and Justice Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Because the trial judge did not err in denying the defendant's motion for a directed verdict where the factual allegations underlying the motion did not dictate granting the motion, the defendant's convictions and sentences are affirmed.

¶ 2    The defendant, Steven Murphy, brings this consolidated direct appeal following a single trial by jury, on joined charges, in the circuit court of Jefferson County. For the following reasons, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4     Although the defendant in this case was convicted, following his September 2016 jury trial, of first degree murder, aggravated arson, and residential arson (the latter of which was merged, posttrial, with the aggravated arson conviction), the sole issue raised by the defendant in this consolidated appeal relates to his conviction for aggravated arson. He does not challenge his murder conviction and sentence. He also does not raise any issue regarding the charging instrument. Accordingly, we discuss in detail only those facts necessary to our disposition of the issue raised by the defendant, and, for purposes of context only, provide as well a brief summary of other facts related to the defendant's trial and convictions.

¶ 5     On September 28, 2015, the defendant was indicted, in case number 15-CF-361, on the charge of aggravated arson. The indictment alleged that "on or about June 28, 2015," the defendant "committed the offense of aggravated arson, in that, while committing an arson, said defendant knowingly partially damaged a building of [the victim], being a residence, *** knowing that [the victim] was present therein, in violation of 720 ILCS 5/20-1.1, a Class X felony."

¶ 6     On May 19, 2016, the defendant was indicted, in case number 16-CF-197, on two counts of first degree murder, related to the death of the victim in case number 15-CF-361.

¶ 7     On May 24, 2016, the defendant filed a motion for compulsory joinder of his aggravated arson and residential arson case with his recently-filed murder case, contending that joinder was compulsory because all the charges were based upon "the same act." Again utilizing his "same act" theory, the defendant that same day filed a motion to dismiss the

2

murder charges on speedy trial grounds because of the length of time between the filing of the arson charges and the murder charges, during which the defendant was in custody. On June 6, 2016, the State filed a combined memorandum of law in opposition to the motions for compulsory joinder and dismissal, contending that the charges did not relate to the same act, and providing a proffer of the facts the State believed it would be able to prove at trial that showed that the charges did not relate to the same act. Following a hearing, the trial judge took the defendant's motions under advisement, and subsequently denied them. Of relevance thereto for purposes of the arguments put forward by the defendant in this appeal, we note that prior to trial and at trial, the State's theory was, in essence, that it could prove that the defendant met the victim at a small house party at the victim's residence, returned to that residence after the party ended and sexually assaulted, physically assaulted, and strangled the victim, then returned to the residence a final time, approximately 9 to 10 hours later, and set fire to the residence in an attempt to destroy evidence of his earlier acts. Prior to trial, the trial judge granted the defendant's subsequent motion for permissive joinder, and a single trial was held on all three charges.

¶ 8     At trial, during the State's presentation of its case, the State attempted to prove its theory with, *inter alia*, the following: (1) testimony of witnesses, including the victim's adult daughter, who had been at the party, as well as a witness who saw the defendant in the vicinity of the residence around the time the fire began, and another witness who could not identify the defendant, but saw a man resembling the defendant in the vicinity of the residence around the time the fire began; (2) testimony from law enforcement officers and other officials involved in the investigation; (3) video footage—as well as still photographs

3

derived from that video footage—from the surveillance system of a gas station near the victim's residence, showing the defendant at the gas station shortly before the fire began; and (4) documentary evidence from the home security system of the victim's residence, which indicated the times at which the front and back doors of the residence were opened, at and around the times in question at trial, and which showed that approximately four to five minutes passed between the defendant's return to the residence at approximately 11:16 a.m. (approximately 9 to 10 hours after the State contended the physical and sexual assaults occurred) and the fire alarm going off within the residence at approximately 11:20 a.m.

¶ 9 Of significance to the issue raised by the defendant on appeal, the State also presented testimony, in support of the theory it believed it could prove, from the following three witnesses: Dr. John Heidingsfelder, firefighter Ryan Clinton, and arson investigator Bruce Dahlem. Their testimony is described in detail below.

¶ 10 With regard to Dr. Heidingsfelder, at the request of the State following its preliminary questioning of him—and without objection from the defense—Dr. Heidingsfelder was qualified by the trial judge as an expert witness in forensic pathology. He testified that on June 29, 2015, he conducted the autopsy on the victim at a local funeral home. In terms of the background knowledge he had been given before beginning the autopsy—knowledge that he testified helped him interpret the autopsy findings in this case—he testified that he was told the victim "was found more or less face-down on the floor in the living room with burning to her body," and that he "was told that there were areas of burning in the residence that were separate—away from this spot and that arson was suspected and accelerants were suspected in the cause of this fire."

4

¶ 11    Dr. Heidingsfelder testified that during his external examination of the victim's body during the autopsy, he observed that the victim had extensive third degree burns to her skin, including some charring of the skin, but that there were also still some pink areas of skin. He testified that he believed the pink areas were where the victim "had contact with the floor." He testified as to the other injuries on the victim's body, including a laceration to her scalp. He testified that he collected swabs for a sexual assault kit, which he turned over to a police detective who was present at the autopsy.

¶ 12    Dr. Heidingsfelder testified that during his internal examination of the victim's body during the autopsy, he found damage to the victim's neck and throat area, including fractures to the voice box and hyoid bone. He was asked if he saw damage to the neck and throat area that showed evidence of an arson. He testified that "if someone is in a fire and they are alive, they will breathe in smoke, and that smoke I can see in the airways, in the larynx, or in the trachea, but I did not see soot deposits in those areas." When asked what he believed this meant, Dr. Heidingsfelder testified, "it suggests to me that she may have been deceased at the time of the fire." He testified as to additional bruising he found, in various areas, during his internal examination. When asked if it appeared that there were "multiple blows to the head," he answered that he found four distinct areas of bruising to the head.

¶ 13    When asked if he had an opinion as to "what happened to" the victim's neck, Dr. Heidingsfelder testified as follows:

5

"She has evidence of a manual assault to her neck caused by a person—the hand of a person squeezing her neck, causing bruising to the tissues of her neck, which resulted in a fracture of the hyoid bone."

Dr. Heidingsfelder characterized this as "manual strangulation, being strangled by a person." He testified that the weight of her organs supported the conclusion that she died as a result of manual strangulation, stating that "[i]f she had died from smoke inhalation, I would expect the lungs to have a heavier weight than normal." With regard to other testing he conducted, Dr. Heidingsfelder testified that the carboxy hemoglobin level led him to conclude that the victim "did not have smoke inhalation" and "was likely deceased at the time of the fire." He testified that because of the alcohol found in the victim's system, and other drugs found therein, she was "sedated and moderately intoxicated," which made "her an easier victim of an assault." He testified that the victim "would not have been neurologically *** normal" at that time. When specifically asked if he could render an opinion as to the time of the victim's death, Dr. Heidingsfelder testified that one factor that is significant is when a victim's body is found, and that because of the way fire impacts a victim's body, "[s]he could have been deceased for minutes or hours before she was found, but I can't tell you how many." His expert opinion as to the cause of death, however, was that it was "asphyxiation due to a manual strangulation." Dr. Heidingsfelder was not asked, and did not testify with regard to, how long it would take a person with the victim's strangulation injuries to die from those injuries. On cross-examination, Dr. Heidingsfelder was not asked questions about, and did not testify further with regard to, the time of death of the victim.

6

¶ 14    Ryan Clinton, a firefighter and captain with the Jefferson Fire Protection District, testified that he was certified as a fire investigator with the state of Illinois. He testified that on the morning of June 28, 2015, he received a dispatch that the Mt. Vernon Fire Department "was requesting mutual aid for a house fire with possible people trapped." He testified that he responded to the scene, and although he did not testify as to the exact time he arrived, he testified that Mt. Vernon firefighters were already present at the scene. He testified that when he arrived, "[t]here was still heavy smoke showing from the second floor of the residence from the eaves, the roofline." He testified that the fire was not extinguished. He testified that once the fire "was brought under control," he was asked to accompany a Mt. Vernon firefighter into the residence because the firefighters believed "there was still a victim inside" and they wanted to "locate the body." Clinton testified that he and the other firefighter entered the residence through the front door and found a body "within four to six feet" of the front door. The defendant's trial counsel declined to cross-examine Clinton.

¶ 15    At the request of the State following its preliminary questioning—and again without objection from the defense—Bruce Dahlem was qualified by the trial judge as an expert witness in fire investigation. He testified that he was an arson investigator with the State Fire Marshal's office on June 28, 2015, and was asked to investigate the fire at issue in this case. He testified that he began his investigation at approximately 2:30 p.m. on that date, after the fire was extinguished. He did not find an exterior cause for the fire. Once he entered the residence, he photographed the victim's body and the "fire debris" on it and surrounding it. He also photographed the victim's body with the fire debris removed. He

7

checked the basement of the residence to see if the fire might have started there, but found "no smoke, no fire, no heat damage in the basement, nothing that *** would have caused the fire."

¶ 16 Dahlem testified with regard to a sketch he had made of the premises, which showed his findings. He testified that the "elongated" flames in his sketch showed the "direction of fire travel from the locations of fire origin" on the first floor to various windows, doors, or other areas. He testified that there were three separate fires set on the first floor of the residence. A fourth fire was set in a bedroom on the second floor of the residence, as evidenced by "fire damage" near the foot of the bed in that bedroom. When asked if his findings showed that the fire set in the bedroom on the second floor of the residence "extended into any room or spread in any manner," Dahlem testified that the fire "did not." He authenticated photographs he had taken at the residence during his investigation, which were admitted into evidence and published to the jury.

¶ 17 While describing one of the photographs, Dahlem testified that a canine had "alerted" to the presence of an accelerant at the source of a fire in an office on the first floor of the residence. When asked if that source was "an actual fire" or "just one that may have been attempted," Dahlem testified, "No, no. No, there was very little damage. I don't think —I'm not sure. I don't recall if it burned much or if it just burned itself out or if it never took off at all." Dahlem testified that his expert opinion was that the fire at the residence was "incendiary," rather than accidental, and that it was caused by:

> "an ignitable liquid poured or splashed on the couch in the living room, an ignitable liquid poured or splashed on the victim in the living room, ignitable liquid poured

8

or splashed on the stairway to the second floor, and an ignitable liquid poured onto the bed—the foot of the bed in the second floor—in the second floor, center bedroom."

He was not asked about, and did not testify with regard to, the order in which the fires were set.

¶ 18 After the State rested its case, the defendant's trial counsel moved for a directed verdict. He contended, *inter alia*, that he believed (1) the trial judge's prior ruling denying the defendant's motions for compulsory joinder and dismissal, (2) the State's theory of the case, and (3) the evidence presented by the State at trial—in particular the testimony of Dr. Heidingsfelder—all proved that the victim "was deceased at the time of the fire." He contended that, as a matter of law, a charge of aggravated arson could not be sustained if the victim was already deceased—or, as he put it, was no longer a "person" for purposes of the aggravated arson statute—at the time of the fire. He cited legal authority that he believed supported this proposition. He did not cite legal authority, or invoke any legal theory, for the proposition that the trial judge's prior ruling on the motions for joinder and dismissal, or the State's theory of the case (as opposed to the evidence actually adduced at trial), were relevant considerations for a trial judge when contemplating a defendant's motion for a directed verdict. He also did not cite legal authority, or invoke any legal theory, or in fact make any argument at all, in support of the idea that the trial judge might be bound by his prior ruling on the defendant's motions, or in support of the idea that the State might be bound by its theory of the case, rather than the evidence adduced at trial.

9

¶ 19    In response to the arguments of the parties, the trial judge stated, *inter alia*, the following:

> "Now, a couple of things I want to mention about the aggravated arson, and that is, first off, at least this is my memory that there has not been any evidence presented as to the time of death of the victim. The State has argued in their opening when they believe it is, but that's not evidence. I took some careful notes when Dr. Heidingsfelder was testifying, and I actually *** I believe that I wrote down his exact words as to time of death. He—he addressed it twice. The first time he said, 'She may have been deceased at the time of the fire.' The second time he said, 'She was, likely, deceased at the time of the fire.' He did not say she was definitely dead at the time of the fire."

The trial judge subsequently added, "there's no evidence to show when [the victim] breathed her last breath," and that there was no testimony about how long a person with the physical injuries inflicted by the beating and strangulation would have lived. He noted that there was no evidence about the order in which the four fires were started, and, with regard to the testimony that the victim's "windpipe, or trachea, was free of soot," there was no evidence "as to whether smoke and soot drops to the level of the floor where the body was immediately, or whether it goes up and out the window." He added, "We don't know when she died." The trial judge also found that the legal authority cited by the defendant was not persuasive, because the trial judge believed the Illinois Supreme Court "has not ruled whether or not a dead body is a person" for purposes of the aggravated arson statute. The trial judge denied the defendant's motion for a directed verdict.

10

¶ 20    Thereafter, the defendant exercised his right not to testify. The jury found the defendant guilty of first degree murder, aggravated arson, and residential arson. He was subsequently sentenced to 60 years in prison on the first degree murder conviction and 30 years in prison on the aggravated arson conviction, to be served consecutively. Posttrial motions were denied, and this timely appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, the defendant contends that the trial court erred in denying the defendant's motion for a directed verdict. In support of this contention, he posits that in this case, as a matter of law pursuant to the statute in question, aggravated arson cannot be charged, and a conviction pursuant to such a charge cannot be sustained, because the victim "ceased being a 'person' under the aggravated arson statute as soon as she died, so that the presence of her body in the home was no longer a statutory factor that would elevate arson into aggravated arson." He concludes his opening brief by arguing that as a result, the trial judge "erred in denying the defense motion for directed verdict as to aggravated arson." He asks this court to vacate the defendant's aggravated arson conviction and remand for judgment and sentencing on residential arson.

¶ 23    We note that the defendant's arguments on appeal, as in the trial court, are all premised upon the defendant's assertion that there can be no conviction for aggravated arson if the victim was already deceased at the time the arson was committed, and rely for their viability upon his factual assertion that the victim in this case was in fact deceased at the time the arson was committed. We note as well that in response to the defendant's initial brief, the State in its brief addresses the issue of the propriety of the jury instructions

11

in this case. However, in his reply brief, the defendant contends the State "misunderstands" the defendant's argument related thereto, and the defendant asserts unequivocally that he is not challenging the jury instructions in this case, stating "The jury instructions were fine. It was the court itself that was in error." He again asserts that his contention on appeal is that "it was error for the trial [judge] not to direct a verdict on the aggravated arson charge." We further note that in this appeal, the defendant's appellate counsel does not put forward any arguments with regard to the decision of the defendant's trial counsel to employ a motion for a directed verdict as the procedural mechanism by which to raise the challenges trial counsel wished to raise in this case with regard to the applicability of the aggravated arson statute, and does not take issue with any of the other choices made by trial counsel with regard to this issue. We turn, therefore, to the contested issue, in the form it is raised and presented by the defendant on appeal.

¶ 24    It is certainly true, as the defendant contends, that prior to trial and at trial, the State asserted the position that the victim was deceased before the arson was committed. The State's view of what the evidence would prove, however, was not the issue the trial judge had to address when asked to render a decision on the motion before him: the defendant's motion for a directed verdict at the close of the State's evidence. The standard for granting a directed verdict is a high one. A court should grant a motion for a directed verdict "only if all the evidence, regarded in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could possibly stand." *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 136. This court's standard when we review a trial judge's ruling on a motion for a directed verdict is *de novo*. *Id*. Therefore, we too "view

12

the evidence in the light most favorable to the nonmovant," which requires "that, instead of deciding for ourselves how credible a witness is and instead of deciding for ourselves which evidence to believe or disbelieve," this court will "construe the evidence in a way that supports the nonmovant's case," which means as well that we will "draw inferences in the nonmovant's favor insomuch as it would be reasonably defensible to do so." *Id*. We have held that "[i]f all we can say is that, given the conflicting evidence, the opposite verdict would have been more reasonable, we should affirm the denial of the motion for a directed verdict." *Id*. ¶ 137. We are mindful of the fact that a trial judge "should direct a verdict only if [the judge] finds 'a total failure or lack of evidence to prove any necessary element of the plaintiff's case.' " *Id*. (quoting *Perfetti v. Marion County, Illinois*, 2013 IL App (5th) 110489, ¶ 15). If the trial judge finds that "instead of being presented with no evidence whatsoever to support an element of the plaintiff's *prima facie* case, the jury has to choose among conflicting pieces of evidence, some of which support the element and others of which undermine the element, the trial [judge] should deny the motion for a directed verdict, and we should affirm the denial." *Id*. Along the same lines, a trial judge may not grant a motion for a directed verdict if the determination regarding conflicting evidence is decisive to the outcome. *Id*. ¶ 148.

¶ 25    As the above principles demonstrate, the trial judge—and this court on review— normally would begin by deciding whether the evidence presented supports the elements the State was required to prove. In this case, however, the issue the defendant sought to address, by way of a motion for a directed verdict, was essentially a legal one: whether the charge of aggravated arson in this case was statutorily sustainable, because the victim was

already deceased when the arson was committed. Nevertheless, to address that issue, the trial judge first had to determine whether the factual premise underlying that legal argument—that the victim was in fact already deceased when the arson was committed—was a sound factual premise, based upon the facts in evidence. If it was not a sound factual premise, then the legal basis for challenging the applicability of the statute was eviscerated, and the motion for a directed verdict became, in essence, a hypothetical legal question about the applicability of the statute to a set of facts—a victim who was deceased when the arson was committed—not necessarily present in the trial over which the judge was presiding. Accordingly, the trial judge rightfully considered, under the proper standard for reviewing a request for a directed verdict—and in light of the fact that the defendant's trial counsel chose to bring his challenge in a motion for a directed verdict and did not invoke any other legal theories or legal authority—whether all the evidence, regarded in the light most favorable to the State, so overwhelmingly favored the defendant's factual premise that the victim was deceased before the arson was committed, that no contrary verdict—in other words, a verdict based upon the fact that the victim was still alive when the arson was committed—could possibly stand. See *id.* ¶ 136.

¶ 26    On appeal, the defendant takes issue with the trial judge's factual conclusions related thereto. He posits that the trial judge "was fixated on the fact that there was no evidence as to [the victim's] exact time of death," contending that in this case, there is "no question that" the victim was deceased "well before the fire was set." He argues that "[n]ot one single piece of evidence from trial *** tended to show that [the victim] was still alive at the time of the fire." Nevertheless, the defendant concedes, as he must, that the victim's

14

"exact time of death was impossible to pin down," but notes that "the autopsy showed no signs of soot in her airway, no fire products in her bloodstream, and no fire injury to the side of her body that had lain on the floor." He also contends that other evidence supports the inference that she died hours before the arson was committed. The evidence that supports the conclusion that she was already deceased, however, is not the only evidence that was appropriate for the trial judge to consider.

¶ 27    Mindful of the standard—discussed in detail above—that the trial judge was to employ when rendering a decision at the close of the State's evidence on the defendant's motion for a directed verdict, and that we are to employ when reviewing the trial judge's decision, we conclude that the facts in evidence support the denial of the defendant's motion for a directed verdict, the defendant's assertions as to the evidence notwithstanding. First, we note that in light of that standard, and in light of the procedural posture of this case, it is not appropriate to characterize the trial judge as "fixated on the fact that there was no evidence as to [the victim's] exact time of death." It was the defendant's trial counsel who chose a motion for a directed verdict as the procedural mechanism by which to raise this issue—a choice with which the defendant's appellate counsel has not taken issue. As the result of trial counsel's choice, the fact that there was no evidence as to the victim's exact time of death necessarily had to play an important role in the trial judge's analysis of the defendant's request for directed verdict, because the defendant's request put the trial judge in a position where he was required to view all the evidence in the light most favorable to the State, and could grant the defendant's request only if he found a total

15

failure or lack of evidence for the proposition that the victim was still alive when the arson was committed. See *id*. ¶¶ 136-37, ¶ 148.

¶ 28 Second, the defendant is not correct in his assertion that there was a total failure or lack of evidence for that proposition. Although he takes issue with the State's characterization of Dr. Heidingsfelder's testimony, claiming it is taken out of context, in fact, as described above, Dr. Heidingsfelder's testimony makes it clear that he was not willing to render an expert opinion that the victim was deceased at the time the fire started, declining to testify with that level of certitude on each occasion that he was asked questions related thereto. First, with regard to the lack of soot deposits in the airways, larynx, and trachea, Dr. Heidingsfelder testified, "it *suggests* to me that she *may have been* deceased at the time of the fire." (Emphases added.) Second, with regard to other testing he conducted, Dr. Heidingsfelder testified that the carboxy hemoglobin level led him to conclude that the victim "did not have smoke inhalation" and "was *likely* deceased at the time of the fire." (Emphasis added.) Third, when specifically asked if he could render an opinion as to the time of the victim's death, Dr. Heidingsfelder testified that one factor that is significant is when a victim's body is found, and that because of the way fire impacts a victim's body, "[s]he *could have been* deceased for minutes or hours *before she was found*, but I can't tell you how many." (Emphases added.) Although firefighter Ryan Clinton did not testify as to the exact time at which he found the victim's body, he testified that firefighters were already on the scene and battling the fire when he arrived, and that he did not enter the residence and find the victim's body until after the fire was under control (presumably extinguished). His testimony supports the conclusion that a significant

16

interval of time passed before the victim's body was found, which in turn supports the conclusion, in light of Dr. Heidingsfelder's testimony, that the victim could have been alive, but unconscious, when the fires were set and still died "minutes or hours before she was found." Moreover, Dr. Heidingsfelder was not asked, and did not testify with regard to, how long it would take a person with the victim's strangulation injuries to die from those injuries.

¶ 29    It was within the context of this expert medical testimony from Dr. Heidingsfelder, as well as the expert testimony from arson investigator Bruce Dahlem, that the trial judge denied the defendant's motion for a directed verdict, ruling that "there's no evidence to show when [the victim] breathed her last breath," and that there was no testimony about how long a person with the physical injuries inflicted by the beating and strangulation would have lived. He noted that there was no evidence about the order in which the four fires were started, and, with regard to the testimony that the victim's "windpipe, or trachea, was free of soot," there was no evidence "as to whether smoke and soot drops to the level of the floor where the body was immediately, or whether it goes up and out the window." He correctly added, "We don't know when she died."

¶ 30    We conclude that from the evidence before the jury at that point in the proceedings, the trial judge could have reasoned, without error, that the jury could conclude that the victim was still alive (but perhaps unconscious from her other injuries or because she remained in the "sedated and moderately intoxicated" state described by Dr. Heidingsfelder) when the defendant set the fires, but died prior to being able to ingest smoke or other chemicals from the fires. Although this could have been true with any of

17

the four fires, we note in particular that the trial judge could have reasoned, again without error, that the jury could conclude that the first fire set by the defendant was the fire set on the second floor, and that the victim could have been alive when that fire was set, but died either prior to, or simultaneous with, the fires on the first floor being set. Indeed, it seems highly unlikely that any would-be arsonist—however inept—would have set multiple fires on the first floor and the stairs leading to the second floor, and then gone to the second floor to set an additional fire there, before attempting to return to the first floor, navigate the fires burning there and in the area of the stairs, and exit the residence to make an escape. Because, according to the expert testimony of Dahlem, the fire set on the second floor caused "fire damage" but did not spread, there was no reason for the jury to believe that the victim, on the first floor, would have breathed the smoke from the second floor fire were she still alive when it was set. Indeed, this fact may be why Dr. Heidingsfelder repeatedly declined to render an expert opinion that the victim was deceased when the fires were set. It is clear that he was aware of this, because he specifically testified—without objection—that in terms of the background knowledge he was given before beginning the autopsy—knowledge that he further testified helped him interpret the autopsy findings in this case—he was told the victim "was found more or less face-down on the floor in the living room with burning to her body," and that he "was told that there were areas of burning in the residence that were separate—away from this spot."

¶ 31 We reiterate the high standard that exists for a directed verdict—the mechanism by which the defendant's trial counsel chose to bring his challenge in this case, and the adverse ruling against which the defendant's appellate counsel has chosen to argue on appeal. As

we explained above, a court should grant a motion for a directed verdict "only if all the evidence, regarded in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict could possibly stand." *Hancock*, 2014 IL App (4th) 131069, ¶ 136. This court's standard when we review a trial judge's ruling on a motion for a directed verdict is *de novo*. *Id.* Therefore, we too "view the evidence in the light most favorable to the nonmovant," which requires "that, instead of deciding for ourselves how credible a witness is and instead of deciding for ourselves which evidence to believe or disbelieve," this court will "construe the evidence in a way that supports the nonmovant's case," which means as well that we will "draw inferences in the nonmovant's favor insomuch as it would be reasonably defensible to do so." *Id.* We have held that "[i]f all we can say is that, given the conflicting evidence, the opposite verdict would have been more reasonable, we should affirm the denial of the motion for a directed verdict." *Id.* ¶ 137. We are mindful of the fact that a trial judge "should direct a verdict only if [the judge] finds 'a total failure or lack of evidence to prove any necessary element of the plaintiff's case.' " *Id.* (quoting *Perfetti*, 2013 IL App (5th) 110489, ¶ 15). If the trial judge finds that "instead of being presented with no evidence whatsoever to support an element of the plaintiff's *prima facie* case, the jury has to choose among conflicting pieces of evidence, some of which support the element and others of which undermine the element, the trial [judge] should deny the motion for a directed verdict, and we should affirm the denial." *Id.* Likewise, a trial judge may not grant a motion for a directed verdict if the determination regarding conflicting evidence is decisive to the outcome. *Id.* ¶ 148.

¶ 32　Applying the foregoing legal principles to the facts in evidence at the close of the State's case—the moment in time at which the trial judge was asked to render the decision that is challenged in this appeal, and long before the jury was instructed as to the law and the State made its closing argument to the jury about what the State believed the evidence in this case showed—we conclude, for the reasons above, that it was appropriate to deny the defendant's motion. Were this a case where the facts in evidence clearly showed that the victim was already deceased when the arson was committed—and it is not difficult to imagine any number of situations where that would be the case, for example where the evidence in a case established that a victim died instantly from a gunshot wound, and the evidence also clearly established that the arson in question was not committed until after the death—the trial judge would have been required to consider the defendant's legal claim about the applicability of the statute. In this case, however, the legal claim of the defendant was not based on such evidence, and therefore the trial judge wisely denied the motion for a directed verdict, the granting of which would have required undue and inappropriate speculation on the part of the trial judge.

¶ 33　Because the sole issue raised by the defendant on appeal is whether the trial judge erred when he denied the defendant's motion for a directed verdict, and because we have found that the trial judge did not err, we do not believe it is appropriate in this appeal to consider the State's alternative arguments in favor of affirming, such as the State's contention that, assuming the victim in this case was already deceased when the arson was committed, the decision of the Illinois Supreme Court in *People v. Thomas*, 137 Ill. 2d 500 (1990), nevertheless permits a conviction for aggravated arson under such circumstances.

¶ 34                                    III. CONCLUSION

¶ 35   For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 36   Affirmed.