NOTICE

Decision filed 02/23/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (5th) 220577-U

NO. 5-22-0577

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 98-CF-1768 |
| | ) | |
| LARRY A. McGEEHON, | ) | Honorable |
| | ) | Thomas E. Griffith Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Presiding Justice Vaughan and Justice McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The trial court's finding that the respondent remained a sexually dangerous person under the Sexually Dangerous Persons Act was not against the manifest weight of the evidence.

¶ 2    In 1999, the respondent, Larry A. McGeehon, was adjudicated a sexually dangerous person under the Sexually Dangerous Persons Act (SDP Act) (725 ILCS 205/0.01 *et seq.* (West 1998)), and the trial court committed him to the custody of the Illinois Department of Corrections (IDOC) until such time as he was no longer a sexually dangerous person. On June 8, 2021, the respondent filed an application for discharge or conditional release pursuant to section 9 of the SDP Act, alleging that he had recovered and was no longer a sexually dangerous person. *Id.* § 9. Following a bench trial, in August 11, 2022, the trial court entered a written order denying the respondent's application. The respondent appeals, arguing that the trial court erred in denying his application

1

for conditional release because he has made dramatic improvement in his treatment such that he is not substantially probable to reoffend, and that the trial court's denial of his application was against the manifest weight of the evidence. For the following reasons, we affirm the judgment of the trial court.

¶ 3                                    I. FACTS

¶ 4       On December 2, 1998, the respondent was charged by information with one count of attempted predatory criminal sexual assault against A.M.P., a minor under the age of 13 (720 ILCS 5/12-14.1(a)(1) (West 1998)), and one count of aggravated criminal sexual abuse against A.M.P., a minor under the age of 13 (*id.* § 12-16(c)(1)(i)). On March 15, 1999, the State filed a petition to proceed under the SDP Act (725 ILCS 205/0.01 *et seq.* (West 1998)). On December 15, 1999, the respondent confessed to the State's petition and the allegations contained therein, stipulated to the two psychiatric evaluation reports, and consented to a court-ordered commitment to the custody of the Illinois Department of Corrections (IDOC), under the guardianship of the Director of Corrections (Director).

¶ 5       On June 8, 2021, the respondent filed a petition for discharge or conditional release pursuant to section 9 of the SDP Act. *Id.* § 9(a). On November 23, 2021, the trial court ordered the IDOC to appoint an evaluator and file a statutorily mandated socio-psychiatric evaluation report on the respondent. See *id.* § 9. On December 16, 2021, the IDOC filed a sexually dangerous persons evaluation report prepared by Dr. Clounch. On February 24, 2022, the respondent filed a motion for the appointment of an expert witness, which was denied by the trial court on March 28, 2022.

¶ 6       The trial court conducted a recovery hearing on the respondent's June 8, 2021, petition for discharge or conditional release application on August 11, 2022. The State's only witness was Dr.

2

Clounch, a clinical psychologist, and defense counsel stipulated to Dr. Clounch's qualifications and as an expert in assessing individuals under the SDP Act. Dr. Clounch testified that he was an employee of Wexford Health Services that contracts with the State of Illinois to perform sexually dangerous persons evaluations and that he had performed an in-person evaluation of the respondent on November 30, 2021. In conducting the evaluation, Dr. Clounch interviewed the respondent about his past, his sexual offenses, his medical and psychiatric history, and his sexually dangerous person's treatment.

¶ 7    Dr. Clounch testified that, in evaluating the respondent, he completed and scored the Static-99R, STABLE-2007, and the violence risk scale offender version, known as the VRS-SO. Dr. Clounch stated that all these assessment tools were empirically verified to show their accuracy. On the Static-99R, Dr. Clounch explained it has a range of scores from negative 3 to 13. Dr. Clounch scored the respondent at either a 4 or a 5. Dr. Clounch stated that the reason for that particular score was that there was an extra sexual offense case in the respondent's history. However, it was unclear to Dr. Clounch if that case was a domestic battery case from 1997, where the respondent was adjudicated delinquent, or another offense that had occurred in May 1998. According to Dr. Clounch, the respondent admitted that one of his domestic battery cases was actually an attempted rape of his mother. According to Dr. Clounch, the respondent's score would be either a 4 or a 5 depending on whether the attempted rape was one of those cases.

¶ 8    Dr. Clounch stated that the Static-99R measured the fact that the respondent would be placed in the above average category level 4A, with either a score of 4 or 5. With a score of 5, the respondent would be in the 88.7th percentile, meaning that 85 of 100 sex offenders would score below the respondent. Dr. Clounch explained that individuals with a similar score of 5 would be 2.7 times more likely to re-offend than someone with a score of 2. If the respondent had a score of

4, Dr. Clounch stated that the respondent would be in the 79.6th percentile, meaning that 74 of 100 sex offenders would score below the respondent, and that the respondent would be 1.94 times more likely to re-offend than the typical sex offender. According to Dr. Clounch, the typical sex offender's rate to re-offend is 10 to 15%, over the course of five years.

¶ 9 Dr. Clounch then testified that the STABLE-2007 utilizes 13 dynamic risk factors to determine an individual's risk to re-offend. Using this assessment, the respondent scored 15 out of a possible 26 points. According to Dr. Clounch, scores of 12 and above indicate a high level of STABLE dynamic risk. The respondent's score of 15 placed him in the 92nd percentile, indicating that 91 of 100 sex offenders would score below the respondent.

¶ 10 Dr. Clounch testified that, for purposes of determining recidivism, the Static-99R and STABLE-2007 are used in conjunction with one another to determine a relative risk ratio and provide an overall risk category for the respondent. When combining the respondent's score of 15 on the STABLE-2007, with a Static-99R score of 4 or 5, it placed the respondent in the "well-above average category" of level 4B. According to Dr. Clounch, the level 4B category is the "highest category that we have for the sex offender risk levels, and it indicates that individual[s] from the group re-offend at a rate of 3 to 4 times the rate of the average offender convicted of the sex offenses."

¶ 11 Dr. Clounch then stated that a third assessment, the VRS-SO, was utilized in his evaluation. The VRS-SO is a combination of an individual's historical and risk factors, and has two separate sections, a static and a dynamic factor. Dr. Clounch scored the respondent at a total of 50 out of a possible 72 in this assessment. This also placed the respondent in the "well-above average" category. This assessment provides both a 5 and a 10 year risk assessment. Using the VRS-SO calculator, the respondent's risk to re-offend for five years would be 27% and for 10 years it would

4

be 39.6%. Dr. Clounch stated that in his professional opinion, the combination of the Static-99R and the STABLE-2007 was the best indicator of the respondent's risk to re-offend.

¶ 12 Dr. Clounch testified that he had a lengthy interview with the respondent to prepare his evaluation. During the interview, the respondent was able answer questions with respect to some of his early treatment terms. The respondent understood the questions regarding his treatment and provided a simplistic understanding of his deviant cycle, at least indicating the level that he had groomed A.M.P. Therefore, the respondent recognized some of the things he did to foster a relationship with that child victim, such as bribing A.M.P. to come to the respondent's home and communicating with the child's mother to allow the child to come to the house. Dr. Clounch stated that this showed that the respondent recognized some of the factors that had led to his past sex offenses. However, Dr. Clounch stated that a significant portion, including his interview and the respondent's treatment, indicated that the respondent primarily attributed his sexual offenses to him being angry or wanting revenge against the victim or others. Further, the respondent indicated that he was getting revenge and hurting others because his brother had hurt the respondent when he was 11 or 12 years old.

¶ 13 Dr. Clounch opined that a significant portion of the respondent's offenses were "due primarily to his sexual deviance and the level at which he has arousal to sexualize violence against women and sexual arousal and attraction to young males." Accordingly, Dr. Clounch believed that it was important for the respondent to "process the sexual deviance specific to sexualized violence and pedophilic interest that will assist [the respondent] in making further progress in treatment, and hopefully reducing his risk sufficiently that he could be released in the community."

¶ 14 When asked his opinion about whether or not the respondent remained a sexually dangerous person, Dr. Clounch opined, based on a reasonable degree of scientific certainty, that

5

the respondent remained a sexually dangerous person. Dr. Clounch was then questioned whether the respondent had any protective factors that would go against this conclusion. In response, Dr. Clounch acknowledged that there were three protective factors he considered regarding the respondent. These three protective risk factors included an individual's advanced age and/or significant health decline, an individual's being in the community for an extended period of time without re-offending, and whether the individual made either significant progress and/or completed a sex offender treatment program.

¶ 15    In addressing these protective factors, Dr. Clounch stated that the respondent was 40 years old, which results in a one-point reduction in his Static-99R score. The respondent had no significant medical issues that would reduce his risk. Further, although the respondent attended and participated in his group sessions, and had made some progress in his treatment, he had not made sufficient progress at that time to reduce his risk. Dr. Clounch acknowledged his awareness of the protective factors, but indicated that they did not change his opinion that the respondent remained a sexually dangerous person.

¶ 16    Per the trial court's prior ruling, Dr. Clounch's December 16, 2021, report was admitted into evidence over the respondent's objection. When asked to summarize why he believed the respondent remained a sexually dangerous person, Dr. Clounch stated that:

>    "I—first, I diagnosed [the respondent] with two sexual disorders, sexual sadism—disorder in a controlled environment, pedophilic disorder sexually attracted to males non-exclusive. I've completed three measures looking at his risk level for future sexual offenses. I believe that he is substantially probable to re-offend if released into the community. And I do not believe at this time he has made sufficient progress in treatment to reduce his risk."

6

¶ 17    On cross-examination, Dr. Clounch acknowledged that the respondent was found sexually dangerous when he was 17 years old and that all of his prior offenses occurred within a quick period of time, in 1997 and 1998. Further, although the respondent had some program violations in the past, he had no disciplinary reports since 2005. Dr. Clounch agreed that the respondent hit "phase 2" treatment in 2019 and that the COVID-19 pandemic caused treatment at the facility to stop until it resumed in May 2021. Dr. Clounch testified that since treatment resumed in May 2021, the respondent had been participating and making progress in his treatment. The respondent was discussing his issues in treatment, with respect to the offense against his mother, and working through his cognitive distortions.

¶ 18    When questioned on the frequency of the respondent's treatment, Dr. Clounch stated that he believed it to be one group session per week, for an hour and a half. Dr. Clounch acknowledged that treatment is available outside of the IDOC facility and that individuals who are placed on conditional release are ordered to obtain treatment as part of their release plan.

¶ 19    During redirect examination, Dr. Clounch restated that in 2019, the respondent was in "phase 2" but that the IDOC no longer used the phases with the treatment program. Dr. Clounch explained that there were four phases when they were utilized. When questioned regarding treatment on conditional release and why he did not believe the respondent was ready for conditional release, Dr. Clounch opined as follows:

> "Well, the concerns are that he hasn't really addressed all of the factors that are related to his offending. Tends to place it based primarily on his anger, I believe anger for [the respondent] is a kind of dis-inhibitor so it was a moderating variable in his offending. But it's not—does not appear to primary mechanism and basis for this offending.

So I would be looking for him to make improvements upon his understanding of his whole offending process to implement appropriate interventions to—so that he can intervene on his cycle, as well as what he is—the process of different things that are going on in his life. And so hopefully he would be able to do that at that time.

I recognize that yes, he could have treatment in the community, but I don't believe he's at a point now in which he would be able to respond appropriately if faced with a situation where he could offend."

In closing, Dr. Clounch agreed that the respondent was engaging in treatment and making some progress, but that the respondent was just not there yet.

¶ 20 At the conclusion of the testimony and arguments of counsel, the trial court ruled as follows:

"[Defense counsel], regarding the [respondent's] age at the time of the offenses and so on, in regarding the length of his incarceration, I do have concerns—great concerns. The [respondent] apparently does have a limited mental capacity. There are obviously very serious allegations. The attempted rape of his mother and then sexual assaults directed against very young children. Doctor Clounch's report was very thorough. He just resourced a lot of sources of information.

The diagnosis is the [respondent] remains a sexually dangerous person. The [respondent] has engaged in treatment, but again his progress is still lacking at this point. I think COVID really has put a real wrench in terms of individuals being able to make progress in treatment. The [respondent] remains a very high risk, so I believe at this time the State has met its burden of proof.

So ***, show again that the Court has considered Doctor Clounch's report dated December 16 of 2021. The sworn testimony and the statements of counsel. Show finding by the Court, the State has met its burden of proof, by clear and convincing evidence, that the [respondent] remains a sexually dangerous person.

Having said that, [respondent], I'm now talking to you, I think you made progress. My thinking here is within the next couple of years if you can continue to make progress— if we have another hearing at that time on a petition for discharge or conditional release— again, if there has been substantial progress in statement, I would think at least my thinking is at this time you would be at least conditionally released into the community at that time." This appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22     Under section 9(a) of the SDP Act, a respondent who has been found to be a sexually dangerous person may submit an application to the trial court setting forth facts showing that he has recovered. 725 ILCS 205/9(a) (West 2020). Section 9(a) of the SDP Act states:

"An application in writing setting forth facts showing that the sexually dangerous person or criminal sexual psychopathic person has recovered may be filed before the committing court. Upon receipt thereof, the clerk of the court shall cause a copy of the application to be sent to the Director of the Department of Corrections. The Director shall then cause to be prepared and sent to the court a socio-psychiatric report concerning the applicant. The report shall be prepared by an evaluator licensed under the Sex Offender Evaluation and Treatment Provider Act. The court shall set a date for the hearing upon the application and shall consider the report so

9

prepared under the direction of the Director of the Department of Corrections and any other relevant information submitted by or on behalf of the applicant." *Id.*

¶ 23    Once the respondent files an application, the court must hold a hearing, and the State has the burden of proving by clear and convincing evidence that the respondent remains a sexually dangerous person. *Id.* § 9(b); *People v. Hancock*, 2014 IL App (4th) 131069, ¶ 139. The respondent is a sexually dangerous person if he has (1) a mental disorder existing for at least one year before the petition was filed, (2) criminal propensities to the commission of sex offenses, and (3) demonstrated propensities toward acts of sexual assault or sexual molestation of children. 725 ILCS 205/1.01 (West 2020); *People v. Holmes*, 2016 IL App (1st) 132357, ¶ 103. " '[C]riminal propensities to the commission of sex offenses' means that it is substantially probable that the person subject to the commitment proceedings will engage in the commission of sex offenses in the future if not confined." 725 ILCS 205/4.05 (West 2020).

¶ 24    The respondent argues that the evidence presented at the recovery hearing did not support the trial court's finding that he remained a sexually dangerous person and the denial of his petition for discharge or conditional release. The trial court's finding that the respondent is still sexually dangerous may not be disturbed on review unless that decision is against the manifest weight of the evidence. *People v. Houde*, 2019 IL App (3d) 180309, ¶ 26. A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Id.* On appeal from a recovery hearing, we must consider all of the evidence introduced at trial in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements to be proven by clear and convincing evidence. 725 ILCS 205/9(a) (West 2020); *People v. Bailey*, 405 Ill. App. 3d 154, 171 (2010). We also note that the trier of fact is in the best

position to weigh the evidence and assess the credibility of the testimony and evidence presented. *Houde*, 2019 IL App (3d) 180309, ¶ 26.

¶ 25 Section 1.01 of the SDP Act defines "sexually dangerous persons" as:

"All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children ***." 725 ILCS 205/1.01 (West 2020).

¶ 26 The crux of the respondent's argument is that he has been committed as a sexually dangerous person since he was 18 years old and is now over 40. During that entire time, the respondent received treatment, had been attending his treatment sessions, and was making progress in his treatment. The respondent contends that evidence was presented that he could be electronically monitored if he was released and that the evidence showed that he had not been getting into trouble as much since 2019. Further, the respondent's probation and suspensions dramatically decreased since July 2019, and it was reported in November 2021 that he participated in treatment, always did his homework, was vocal, and "kind of a leader in that group." The respondent argues that these facts indicate major positive steps and a dramatic improvement in his treatment. Accordingly, the respondent argues that the trial court's decision to deny conditional release was against the manifest weight of the evidence. We disagree.

¶ 27 The sexually dangerous persons evaluation report prepared by Dr. Clounch was admitted into evidence and fully considered by the trial court. In his report, Dr. Clounch extensively set forth the respondent's various mental disorders that have existed for over a year or more, and are accompanied by criminal propensities to the commission of sex offenses. Dr. Clounch testified

11

regarding the statistical testing conducted on the respondent, and that he demonstrated propensities toward acts of sexual assault or molestation of children under the age of 18 years. Although Dr. Clounch acknowledged the young age at which the respondent committed the offenses, Dr. Clounch testified at length that his expert opinion was that the respondent is substantially probable to re-offend if not confined and explained that the respondent had not lessened his propensity to commit sex offenses through treatment.

¶ 28    Dr. Clounch further explained that he used actuarial measures, the Static-99R, STABLE-2007, and VRS-SO, all generally accepted by experts in the field for measuring risk of future offending. All of the actuarial measures indicated that the respondent maintained a high probability of re-offending. Dr. Clounch testified that he considered the potential protective factors that reduced the respondent's risk to re-offend, but opined that the respondent remained a sexually dangerous person.

¶ 29    Therefore, we find that the evidence presented by State, through Dr. Clounch's testimony and report, demonstrated that the respondent remained a sexually dangerous person as defined by the SDP Act and was sufficient for a reasonable fact finder to find by clear and convincing evidence that the respondent remained a sexually dangerous person. After a thorough review, we find nothing in the record that would require us to substitute our judgment for that of the trial court. The trial court was in the best position to evaluate the expert testimony, make credibility determinations, and determine the weight to be given to the evidence and any inferences therefrom. Based on the foregoing, we conclude that the trial court's finding that the respondent remained a sexually dangerous person was not against the manifest weight of the evidence.

¶ 30                                    III. CONCLUSION

¶ 31    For the forgoing reasons, the judgment of the trial court of Macon County is affirmed.

12

¶ 32    Affirmed.